# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                No. CIV 14-0579 JB/CG

ROBERT L. RIVERA, LINDA K. RIVERA,
and the NEW MEXICO DEPARTMENT OF
TAXATION AND REVENUE,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Motion for Default Judgment or in the Alternative Motion for Summary Judgment and Memorandum in Support, filed October 30, 2014 (Doc. 15)("Motion").  The Court held a hearing on January 27, 2015. The primary issues are: (i) whether the Court can enter a default against Defendants Robert Rivera and Linda Rivera, where they have defended themselves exclusively with frivolous, tax-protestor arguments; and (ii) whether the Court should grant summary judgment in Plaintiff United States of America's favor, award the United States damages for the Riveras' unpaid federal income taxes and civil penalties, and order the judicial sale of the Riveras' property, which is subject to a federal tax lien.  The Court will not enter a default, because the Riveras have "ple[]d or otherwise defend[ed]" themselves, however bizarrely, by mailing various cryptic documents to the Court and by appearing, however briefly, at the hearing that the Court held on the Motion.  The Court will, however, grant summary judgment in the United States' favor.  The Riveras do not dispute any of the United States' factual averments, and the United States

supports those averments with evidence that would suffice to carry its burden of production at trial.  The Riveras have no cognizable legal defenses, and summary judgment is thus appropriate.

## <u>FACTUAL BACKGROUND</u>

The Riveras are a married couple with property in Sandoval County, New Mexico.  <u>See</u> Declaration of Tim Lyons in Support of United States' Motion for Default Judgment or in the Alternative Motion for Summary Judgment ¶ 5, at 2, filed October 30, 2014 (Doc. 15-44) ("Lyons Decl.").  A delegate of the Secretary of the Treasury made the following assessments of unpaid federal income taxes against the Riveras -- and provided them with notice and an opportunity to pay -- for the years 1995 through 2009, 2011, and 2012.  <u>See</u> Motion ¶ 1, at 4 (setting forth this fact); Certificate of Official Record, filed October 30, 2014 (Doc. 15-1); Certificate of Official Record, filed October 30, 2014 (Doc. 15-2); Certificate of Official Record, filed October 30, 2014 (Doc. 15-3); Certificate of Official Record, filed October 30, 2014 (Doc. 15-4); Certificate of Official Record, filed October 30, 2014 (Doc. 15-5); Certificate of Official Record, filed October 30, 2014 (Doc. 15-6); Certificate of Official Record, filed October 30, 2014 (Doc. 15-7); Certificate of Official Record, filed October 30, 2014 (Doc. 15-8); Certificate of Official Record, filed October 30, 2014 (Doc. 15-9); Certificate of Official Record, filed October 30, 2014 (Doc. 15-10); Certificate of Official Record, filed October 30, 2014 (Doc. 15-11); Certificate of Official Record, filed October 30, 2014 (Doc. 15-12); Certificate of Official Record, filed October 30, 2014 (Doc. 15-13); Certificate of Official Record, filed October 30, 2014 (Doc. 15-14); Certificate of Official Record, filed October 30, 2014 (Doc. 15-15); Certificate of Official Record, filed October 30, 2014 (Doc. 15-16); Certificate of Official

Record, filed October 30, 2014 (Doc. 15-17)(collectively, "Select Certificates").[1]  The Court will

summarize these assessments in tabular form:

| Type of Tax | Tax Period | Date of Assessment | Amount Due Through June 16, 2014 | Date That the United States Filed Tax Lien |
|---|---|---|---|---|
| 1040 | 1995 | December 11, 2006 | $19,336.73 | July 1, 2013 |
| 1040 | 1996 | December 11, 2006 | $44,011.79 | July 1, 2013 |
| 1040 | 1997 | December 11, 2006 | $43,256.09 | July 1, 2013 |
| 1040 | 1998 | December 11, 2006 | $157,505.21 | July 1, 2013 |
| 1040 | 1999 | December 11, 2006 | $235,787.55 | July 1, 2013 |
| 1040 | 2000 | December 11, 2006 | $97,774.67 | July 1, 2013 |
| 1040 | 2001 | April 7, 2008 | $97,724.72 | July 1, 2013 |
| 1040 | 2002 | April 7, 2008 | $107,796.49 | July 1, 2013 |
| 1040 | 2003 | April 7, 2008 | $76,665.57 | July 1, 2013 |
| 1040 | 2004 | April 7, 2008 | $85,844.29 | July 1, 2013 |
| 1040 | 2005 | May 25, 2009 | $78,042.76 | July 1, 2013 |
| 1040 | 2006 | May 25, 2009 | $80,543.12 | July 1, 2013 |
| 1040 | 2007 | July 2, 2012 | $109,469.98 | August 1, 2012 |
| 1040 | 2008 | April 12, 2010 | $59,418.63 | June 15, 2010 |
| 1040 | 2009 | June 28, 2010 | $29,999.86 | November 1, 2010 |
| 1040 | 2011 | May 28, 2012 | $7,103.75 | August 1, 2012 |
| 1040 | 2012 | April 22, 2013 | $23,955.99 | June 10, 2013 |
| Total: | | | $1,327,237.10 | |

_____

[1]The local rules of civil procedure for the United States District Court for the District of
New Mexico provide:

> The Response must contain a concise statement of the material facts cited
> by the movant as to which the non-movant contends a genuine issue does exist.
> Each fact in dispute must be numbered, must refer with particularity to those
> portions of the record upon which the non-movant relies, and must state the
> number of the movant's fact that is disputed.  All material facts set forth in the
> Memorandum will be deemed undisputed unless specifically controverted.  The
> Response may set forth additional facts other than those which respond to the
> Memorandum which the non-movant contends are material to the resolution of
> the motion.  Each additional fact must be lettered and must refer with particularity
> to those portions of the record upon which the non-movant relies.

D.N.M. LR-Civ. 56.1(b).  The local rules thus require the Riveras' to "specifically controvert[]"
the United States' proposed facts, and, because the Riveras have not done so for any of the facts
in the Motion, the Court deems all of those facts undisputed.  D.N.M. LR-Civ. 56.1(b).  See Fed.
R. Civ. P. 56(e)(2)-(3); Salazar v. City of Albuquerque, No. CIV 10-0645 JB/ACT, 2014 WL
6065603, at *1 n.2 (D.N.M. Oct. 27, 2014)(Browning, J.).  The Riveras also do not set forth any
facts of their own.

See Select Certificates.

Despite notice of the assessments described in the preceding paragraph and table, and the United States' continued demands for payment, the Riveras have failed to fully pay the assessments and are indebted to the United States for the unpaid balance of the assessments -- less payments and credits, plus accruals, including statutory interest and applicable penalties -- as of June 16, 2014, in the aggregate amount of $1,327,237.10, plus interest and other additions to tax allowed by law accruing thereafter.   See Motion ¶ 2, at 5 (setting forth this fact); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-1); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-2); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-3); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-4); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-5); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-6); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-7); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-8); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-9); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-10); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-11); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-12); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-13); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-14); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-15); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-16); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-17).

The United States Treasury also assessed the following civil penalties, statutory additions, and interest against R. Rivera for the years 1995 through 2006 for filing frivolous income tax returns for those years:

| Type of Tax | Tax Period | Date of Assessment | Amount Due Through June 16, 2014 | Date That the United States Filed Tax Lien |
|---|---|---|---|---|
| Civil Penalty | 1995 | October 25, 2010 | $2,026.93 | November 29, 2010 |
| Civil Penalty | 1996 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 1997 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 1998 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 1999 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2000 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2001 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2002 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2003 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2004 | October 25, 2010 | $5,615.42 | November 29, 2010 |
| Civil Penalty | 2005 | October 25, 2010 | $11,230.82 | November 29, 2010 |
| Civil Penalty | 2006 | October 25, 2010 | $11,230.82 | November 29, 2010 |
| Total: | | | $75,027.35 | |

See Motion ¶ 3, at 5-7; Lyons Decl. ¶ 8, at 3; Certificate of Official Record, filed October 30, 2014 (Doc. 15-18); Certificate of Official Record, filed October 30, 2014 (Doc. 15-19); Certificate of Official Record, filed October 30, 2014 (Doc. 15-20); Certificate of Official Record, filed October 30, 2014 (Doc. 15-21); Certificate of Official Record, filed October 30, 2014 (Doc. 15-22); Certificate of Official Record, filed October 30, 2014 (Doc. 15-23); Certificate of Official Record, filed October 30, 2014 (Doc. 15-24); Certificate of Official Record, filed October 30, 2014 (Doc. 15-25); Certificate of Official Record, filed October 30, 2014 (Doc. 15-26); Certificate of Official Record, filed October 30, 2014 (Doc. 15-27); Certificate of Official Record, filed October 30, 2014 (Doc. 15-28); Certificate of Official Record, filed October 30, 2014 (Doc. 15-29).

Despite notice of the assessments described in the preceding paragraph and table, and the United States' continued demands for payment, R. Rivera has failed to fully pay the assessments

and is indebted to the United States for the unpaid balance of the assessments -- less payments and credits, plus accruals, including statutory interest and applicable penalties -- as of June 16, 2014, in the aggregate amount of $75,027.35, plus interest and other additions to tax allowed by law accruing thereafter.  See Motion ¶ 4, at 7 (setting forth this fact); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-18); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-19); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-20); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-21); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-22); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-23); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-24); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-25); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-26); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-27); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-28); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-29).

The United States Treasury also assessed the following civil penalties, statutory additions, and interest against L. Rivera for the years 1995 through 2004 for filing frivolous income tax returns for those years:

| Type of Tax | Tax Period | Date of Assessment | Amount Due Through June 16, 2014 | Date That the United States Filed Tax Lien |
|---|---|---|---|---|
| Civil Penalty | 1995 | September 5, 2011 | $5,492.33 | February 20, 2009 |
| Civil Penalty | 1996 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 1997 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 1998 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 1999 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 2000 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 2001 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Civil Penalty | 2002 | September 5, 2011 | $5,438.27 | February 20, 2009 |

| Civil Penalty | 2003 | September 5, 2011 | $5,438.27 | February 20, 2009 |
|---|---|---|---|---|
| Civil Penalty | 2004 | September 5, 2011 | $5,438.27 | February 20, 2009 |
| Total: | | | $54,436.76 | |

See Motion ¶ 5, at 7-8; Lyons Decl. ¶ 9, at 3; Certificate of Official Record, filed October 30, 2014 (Doc. 15-30); Certificate of Official Record, filed October 30, 2014 (Doc. 15-31); Certificate of Official Record, filed October 30, 2014 (Doc. 15-32); Certificate of Official Record, filed October 30, 2014 (Doc. 15-33); Certificate of Official Record, filed October 30, 2014 (Doc. 15-34); Certificate of Official Record, filed October 30, 2014 (Doc. 15-35); Certificate of Official Record, filed October 30, 2014 (Doc. 15-36); Certificate of Official Record, filed October 30, 2014 (Doc. 15-37); Certificate of Official Record, filed October 30, 2014 (Doc. 15-38); Certificate of Official Record, filed October 30, 2014 (Doc. 15-39).

Despite notice of the assessments described in the preceding paragraph and table, and the United States' continued demands for payment, L. Rivera has failed to fully pay the assessments and is indebted to the United States for the unpaid balance of the assessments -- less payments and credits, plus accruals, including statutory interest and applicable penalties -- as of June 16, 2014, in the aggregate amount of $54,436.76, plus interest and other additions to tax allowed by law accruing thereafter.  See Motion ¶ 6, at 8 (setting forth this fact); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-30); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-31); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-32); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-33); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-34); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-35); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-36); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-37); Internal Revenue Service Account Transcript, filed

June 24, 2014 (Doc. 1-38); Internal Revenue Service Account Transcript, filed June 24, 2014 (Doc. 1-39).

By virtue of the Riveras' neglect or failure to pay in full, after such notice and demand, the assessments described in the above paragraphs, the United States obtained liens against the Riveras' property under 26 U.S.C. §§ 6321-6322, which went into effect on the dates of assessment in an amount equal to the unpaid assessments, plus statutory additions, against all property and rights to property belonging to them, including, but not limited to, the Sandoval County property, which is more particularly described as follows:

> Lot Numbered Seventy-five (75) of Ranchos De Placitas, Unit 2, a Subdivision in Section 36, T 13 N, R 4 E, N. M. P. M., Sandoval County, New Mexico, as the same is shown and designated on Plat thereof, filed in the Office of the County Clerk of Sandoval County, New Mexico, on December 7, 1959.

Motion ¶ 7, at 9 (setting forth this fact).  See Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-40); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-41); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-42); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-43); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-44); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-45); Notice of Federal Tax Lien, filed June 24, 2014 (Doc. 1-46) (collectively, "Select Notices of Tax Liens").  The Internal Revenue Service ("IRS") filed these tax liens in the Sandoval County recording office on the following dates for the following amounts:

| Taxpayer | Type of Tax | Tax Period | Unpaid Balance of Assessment | Notice of Tax Lien Filing Date |
|---|---|---|---|---|
| Both Riveras | 1040 | 1995-2000 | $357,502.05 | July 1, 2013 |
| Both Riveras | 1040 | 2007-2011 | $108,888.09 | August 1, 2013 |
| Both Riveras | 1040 | 2008 | $48,031.57 | July 15, 2010 |
| Both Riveras | 1040 | 2009 | $22,515.42 | November 29, 2010 |
| Both Riveras | 1040 | 2012 | $20,419.68 | July 10, 2013 |
| R. Rivera | Civil Penalty | 1995-2006 | $70,000.00 | November 29, 2010 |
| L. Rivera | 1040 | 1995-2004 | $545,039.61 | February 20, 2009 |

| R. Rivera | 1040 | 1995-2004 | $543,301.63 | February 20, 2009 |
| L. Rivera | Civil Penalty | 1995-2004 | $50,000.00 | October 19, 2013 |
| R. Rivera | 1040 | 2005-2006 | $87,010.94 | June 19, 2009 |
| Both Riveras | 1040 | 2001-2006 | $477,668.73 | July 1, 2013 |

See Select Notices of Tax Liens.  The Riveras admit that the Sandoval County property is their home.  See Motion ¶ 9, at 10 (setting forth this fact); Special Appearance by Statutory Entities Robert L. Rivera, Linda K. Rivera, and Robert L. Rivera, Linda K. Rivera, The United States Owns the Above Fictitious Persons Names from Birth to Death at 2, 4, 16-19, filed September 16, 2014 (Doc. 9).

## PROCEDURAL BACKGROUND

The United States initiated this case with a Complaint, filed June 24, 2014 (Doc. 1), seeking to reduce to judgment: (i) federal income tax assessments against the Riveras for the years 1995 through 2009, 2011, and 2012, based on the joint income tax returns they filed for those years, see Complaint ¶¶ 9-11, at 3-4; and (ii) civil penalty assessments for the years 1995 through 2006 against R. Rivera and civil penalty assessments for the years 1995 through 2004 against L. Rivera for filing frivolous returns for those years, see Complaint ¶¶ 12-17, at 5-8.  The United States further seeks to foreclose federal tax liens currently imposed upon the Riveras' property in Sandoval County and to undertake a judicial sale of the property and distribution of the sale proceeds.  See Complaint ¶¶ 18-29, at 8-10.  Defendant New Mexico Department of Taxation and Revenue ("NM Taxation and Revenue") answered the Complaint within a month. See Answer of New Mexico Taxation and Revenue Department, filed July 14, 2014 (Doc. 4)("Answer").  NM Taxation and Revenue does not dispute any of the Complaint's factual allegations, see Answer ¶ 1, at 1, but it asserts that it has perfected at least two liens that have priority over the United States' liens with respect to the Riveras' Sandoval County property: one filed on October 1, 2012, for $19,563.33, see Answer ¶ 3a, at 2; and the other filed on October

22, 2012, for $53,608.83, see Answer ¶ 3b, at 2.  NM Taxation and Revenue asks that, when the Court orders the foreclosure and judicial sale of the Riveras' property, $73,172.16 of the proceeds go to NM Taxation and Revenue off the top.  See Answer at 2.

On August 27, 2014, the Riveras were each personally and individually served with a summons and a copy of the complaint.  See Summons and Proof of Service as to R. Rivera, filed September 8, 2014 (Doc. 6); Summons and Proof of Service as to L. Rivera, filed September 8, 2014 (Doc. 7).  From that point forward, R. Rivera proceeded to file -- purportedly on behalf of both himself and L. Rivera[2] -- a number of documents with the Court, most of which defy easy description.  His first filing is titled a Private Mandatory Judicial Notice Order/Acceptance for Honor In Condition to Settle and Close, filed September 12, 2014 (Doc. 8)("Letter"), and R. Rivera styles it as a letter to a Deputy Clerk of the Court for the United States District Court for the District of New Mexico.  See Letter at 1.  The Letter's subject line states that it refers to a "Letter Rogatory for" the case.  Letter at 1.  In the Letter, he refers to himself and his wife as "private living beneficiaries" and "living souls/spirits."  Letter at 1.  Their legal names, however, R. Rivera contends, are "property of the United States," apparently given in return "for the protection and defense of the United States rights/interests with acceptance of loyalty oath and

---

[2]A husband may not sign pleadings on his wife's behalf, unless the husband happens to be the wife's attorney.  See Fed. R. Civ. P. 11(a) ("Every pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name -- or by a party personally if the party is unrepresented.").  This simple rule -- that only an attorney may sign for another person -- has caused problems in tax-protestor cases before the Court, see United States v. Hopkins, No. CIV 11-0416 JB/WPL, 2013 WL 684650, at *1 n.1 (D.N.M. Feb. 11, 2013) (Browning, J.)("[H]e may not file[] papers on behalf of his wife, Defendant Sharon Hopkins, because he is not her attorney. . . .  If S. Hopkins wishes to file documents with the Court, she must sign them herself."), but, as the Riveras' core substantive defense involves them being unable to sign even for themselves -- what with their names referring to government-owned shell corporations rather than natural persons -- the Court will deal with the merits of the case against L. Rivera, rather than procedurally defaulting her for this deficiency in form.

pension bond." Letter at 1. R. Rivera also asserts that these United States-owned property interests -- which "are operating as private state citizens of New Mexico [as] 'private vessels'" under their names -- also have their own "exemption accounts," which R. Rivera graciously offers to exhaust "to settle and close the court case." Letter at 1.

There are two additional themes running through the Letter. One is that, for some reason, lower-case spelling of the Riveras' names indicates -- in R. Rivera's mind, at least -- that one is talking about the natural persons, where the use of traditional capitalization conventions indicates that one is talking about the government-owned property. Second, there is something in the Letter about the United States Treasury no longer issuing valid currency -- and debts thus being payable in "honor" -- because of the Treasury's "1977"[3] decision to abandon the gold standard. Letter at 1-2. R. Rivera attached his and his wife's birth certificates to the Letter, as well as documents for himself and his wife purporting to execute a fiduciary relationship between them and the Deputy Clerk of the Court to whom the Letter is addressed. See Letter at 3-12. He also attached what appears to be the original summonses to the Letter, with "Accept for honor" handwritten in large letters in black ink across each document. See Letter at 13-14.

---

[3]President Franklin D. Roosevelt moved the United States off the gold standard in 1933 via several Executive Orders and Acts of Congress. See Emergency Banking Act, Pub. L. No. 1, 48 Stat. 1; Agricultural Adjustment Act, Pub. L. No. 73-10, 48 Stat. 31; Executive Order 6261 (issued Aug. 29, 1933); Executive Order 6260 (issued Aug. 28, 1933); Executive Order 6111 (issued Apr. 20, 1933); Executive Order 6102 (issued Apr. 5, 1933); Executive Order 6073 (issued Mar. 10, 1933). See also Gold Reserve Act, Pub. L. No. 73-87, 48 Stat. 337. One of the more prominent ones, Executive Order 6102, criminalized so-called gold clauses -- contractual provisions requiring that debt be paid in gold rather than in United States currency. President Richard M. Nixon ended all direct convertibility of United States currency into gold in 1971, effectively ending the global Bretton Woods system -- a sort of quasi-gold standard -- and replacing it with the present system of free-floating fiat currencies. To the extent that anything pertinent to gold or the gold standard happened in 1977, it was the passage of 31 U.S.C. § 5118, which conditions, but implicitly allows, gold clauses in private contracts.

Four days after sending the Letter, the Riveras[4] submitted a document titled a Special Appearance by Statutory Entities Robert L. Rivera, Linda K. Rivera, and Robert L. Rivera, Linda K. Rivera, The United States Owns the Above Fictitious Persons Names from Birth to Death, filed September 16, 2014 (Doc. 9)("Special Appearance").  The Special Appearance asserts that "[t]hird party(s) robert, linda are the real parties in interest, NOT infants lost at sea and are General Executors . . . and are competent as living breathing souls/spirits to handle their own affairs."  Special Appearance at 1.  They state that they "are citizens of the private sovereign people [of] new mexico state and private United States of America National(s)," and ask the Court or the United States to "SHOW CAUSE and bring settlement and closure to the Plaintiff's alleged charges."  Special Appearance at 2.

To the extent that the Special Appearance advances an argument, it appears to be that they are improper parties to the action:

> How is it possible for the United States to have a controversy with the United States as the United States owns STATUTORY ENTITIES ROBERT L. RIVERA, LINDA K. RIVERA and Robert L. Rivera, Linda K. Rivera?  As the United States bought all the property (land/people) it is all public property that is not taxable and there is misadministration and mis-application of International Law.

Special Appearance at 2.  They also argue, in the same vein, that their inclusion in the lawsuit violates the dictate of rule 17 of the Federal Rules of Civil Procedure, which provides that "'[e]very action shall be prosecuted in the name of the real party in interest.'"  Special Appearance at 2 (quoting Fed. R. Civ. P. 17(a)(1)).  There are a few other stray arguments scattered throughout the Special Appearance, including: (i) that, "[a]s there is no affidavit annexed proper service of summons has not been perfected and there is no valid jurisdiction,"

---

[4]This document is the only one that both Riveras personally signed.

Special Appearance at 3; (ii) that, because the Riveras are not citizens of the District of Columbia, they are not subject to the United States' power and there is thus no jurisdiction,[5] see Special Appearance at 3; (iii) that international law requires that "'[e]veryone ha[ve] the right to . . . housing,'" and that this provision prohibits foreclosure -- apparently as a general matter, Special Appearance at 4 (quoting Universal Decl. of Hum. Rights Art. 25); and (iv) that the IRS is a "Corporation for-profit and is NOT a UNITED STATES Government Department/Agency," and, thus, the United States has no "jurisdiction and/or authority" to represent it, Special Appearance at 4-5. The Special Appearance is signed "[rivera], robert," and "[rivera], linda," with brackets and lower-cases in the signature. Special Appearance at 6. Many of the same documents that were attached to the Letter are also attached to the Special Appearance, and the Special Appearance also contains several mostly blank pages with "Pay to the order of the United States Treasury" written on them in large handwritten letters and signed by R. Rivera, with "without recourse" written under the signature. Special Appearance at 9, 13, 22, 25.

Less than a month later, R. Rivera sent the Court another letter, again captioned as a special appearance. See Special Appearance October 8, 2014, filed October 9, 2014 (Doc. 14) ("Correspondence"). The Correspondence relies heavily on 12 U.S.C. § 95a(2). The Correspondence is two letters, one of which is a handwritten cover letter to the Court, which describes the second letter, which is a typed letter to United States Secretary of the Treasury Jacob J. Lew. See Correspondence at 1-2. The letter to Treasury Secretary Lew states:

---

[5]The Court cannot discern whether the Riveras' argument is (i) that they do not have to obey the United States tax laws in the first instance, because the United States' power is limited to the District of Columbia; or (ii) that the Court -- an arm of "the United States," in the broadest sense -- lacks jurisdiction, because the judicial power, specifically, of the United States is limited to the District of Columbia.

> All of the enclosed offers are accepted for honor and robert hereby assigns, as a gift, these offers on the condition that said debt be retired and never be reissued. robert surrenders any and all interest to the United States; that interest is reversionary and robert has relied on Title 12 USC 95a(2) for full acquittance and discharge of any further obligation regarding this matter.

Correspondence at 2.   The letter is signed -- vertically, for some reason -- "robert." Correspondence at 2.

The portion of the Correspondence that is a letter to the Court introduces the letter to Secretary Lew, and, additionally, clarifies that "[t]he United States owns the fictitious name person of Robert L. Rivera, Linda K. Rivera," and that "robert, linda have assigned/transferred as a gift title/interest to the United States, that intent is reversionary . . . for full acquitance and discharge of any further obligation regarding this matter."   Correspondence at 1.   In addition to the two letters, the Correspondence also includes unopened returns of various envelopes that the Clerk of the Court sent to the Riveras, with handwritten inscriptions pointing to the addressee line and stating "Name owned by the United States."   Correspondence at 3, 4.

On October 30, 2014, the United States filed the Motion.   The Motion first sets forth the United States' proposed facts.   See Motion at 4-10.   As the Riveras did not respond to the Motion's factual adductions in any recognizable way, and because the Motion supports its factual propositions with citations to the record, its proposed facts are largely repeated in the Factual Background section of this Memorandum Opinion and Order.   After setting forth its proposed facts, the United States makes its argument that the Court should enter a default judgment against the Riveras.   See Motion at 11-15.   It points out that the Riveras have not answered the Complaint and that over twenty-one days have passed, thus putting them in violation of rule 12(a)(1)(A)(i).   See Motion at 11.   It states that, under rule 8(b)(6), a failure to deny allegations is an admission of those allegations, and that the Riveras have therefore

admitted the Complaint's allegations in full, warranting a default judgment.  See Motion at 11.
The United States contends, essentially, that the Riveras' "tax protestor type arguments" are the
same as no argument at all, and that courts nationwide have found them to be "frivolous" and
"repeatedly rejected" them.   Motion at 12.   The United States notes that other courts have
sanctioned defendants who defended themselves with "'tax protestor gibberish,'" Motion at 13
(quoting Edwards v. Comm'r, 84 T.C.M. (CCH) 24, 38 (2002), aff'd 119 F. App'x 293 (D.C.
Cir. 2005)), and that the Anti-Injunction Act, 26 U.S.C. § 7421, bars the Court from granting the
relief that the Riveras seek, see Motion at 14-15 ("'[N]o suit for the purpose of restraining the
assessment of collection of any tax shall be maintained in any court . . . .'"  (omission in Motion
but not source statute)(quoting 26 U.S.C. § 7421)).

The United States also argues that, even if the Court does not grant it a default judgment,
the Court should grant it summary judgment, see Motion at 15, and allow it to foreclose the tax
liens on the Riveras' property, see Motion at 16-17.   The United States asserts that it has
"perfected the tax liens against the Riveras as to certain third parties" by filing Notices of Federal
Tax Liens, which the United States attaches to its Motion.   Motion at 16.   The United States
contends that, "[e]ven though the Riveras may claim the Sandoval County property as their
homestead, the Court has jurisdiction to foreclose the tax liens upon it" under 26 U.S.C. § 7403.
Motion at 17 (citing United States v. Rodgers, 461 U.S. 677 (1982)).

After the United States filed its Motion -- both before and after the Court held its hearing
on the Motion -- the Riveras proceeded to inundate the Court, by mail, with loads of voluminous
documents -- 687 pages of them.  See Notice of Documents Received, filed November 4, 2014
(Doc. 16); Notice of Documents Received, filed November 6, 2014 (Doc. 17); Notice of
Documents Received, filed November 13, 2014 (Doc. 18); Notice of Documents Received, filed

November 25, 2014 (Doc. 20); Sealed Notice of Documents Received, filed January 27, 2015 (Doc. 22); Notice of Documents Received, filed March 17, 2015 (Doc. 24); Notice of Exhibits, filed March 20, 2015 (Doc. 25); Notice of Exhibits, filed April 21, 2015 (Doc. 26).  These filings all flout the page-limit, captioning, and briefing-sequence strictures of the United States District Court for the District of New Mexico's Local Rules of Civil Procedure, and the Court will not summarize them here.  The Court has, however, skimmed through them, and it is comfortable concluding that the Riveras will suffer no prejudice from the Court's decision to not consider these documents at length; the documents are incoherent, and they appear to be a hodgepodge of various premade tax-protestor manifestos, which do not relate directly to this case.

The Court held a hearing on the Motion on January 27, 2015.  See Transcript of Hearing (taken Jan. 27, 2015)("Tr.").[6]  The Riveras both appeared personally[7] at the hearing, but,

---

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

[7]Both of the Riveras appeared personally, but the Riveras' legal position turns even this basic observation into a fight.  After R. Rivera -- or the man whom the Court concludes is R. Rivera -- announced that he would have to leave for medical reasons, the Court engaged the Riveras in the following exchange:

> THE COURT:  Well, let's at least get appearances, everybody that's here, so we have it for the record.  [To the man in the gallery:] You're Robert Rivera?
>
> MR. RIVERA:  I am not.  I am not a statutory corporate citizen.  I'm not.
>
> THE COURT:  Well, are you Robert Rivera?
>
> MR. RIVERA:  I am who I am.
>
> . . . .
>
> THE COURT:  [To the woman next to the man in the gallery:] Well, are you Linda Rivera?
>
> MRS. RIVERA:  Yes.

immediately upon the Court beginning the hearing, R. Rivera stated that he had to leave, because he believed that "a blood vessel [had] bust[ed] inside of [his] brain" and he was feeling nauseous.  Tr. at 1:17-19 (R. Rivera).  The Court stated that it was disinclined to postpone the hearing, given that the United States had traveled out from Dallas, Texas to attend it, see Tr. at 4:4-5 (Court)("[W]e've got a lawyer that's flow[n] in from Dallas."), and the Court was not required to hold a hearing on the Motion, see Tr. at 5:10-11 (Court)("I don't have to have a hearing at all."  (referring to D.N.M. LR-Civ. 7.6(a) ("A motion will be decided on the briefs unless the Court sets oral argument.")))  .  The Riveras left the hearing, and the Court allowed the United States to put on a brief presentation.  See Tr. at 5:24-6:1 (Court); Clerk's Minutes, filed January 27, 2015 (Doc. 23)(noting that the Riveras left the courtroom at 1:42 p.m. MST, seven minutes after the hearing began).

The United States added little to its papers as it relates to the Riveras, but it noted that NM Taxation and Revenue -- which did not send a representative to the hearing -- "didn't actually oppose" the Motion.  Tr. at 2:16-18 (DuBose).  It also asserted that six of the eleven total federal tax liens against the Riveras predate NM Taxation and Revenue's liens, and that, "under the common law principle of first in time is first in right, the United States should prevail" over the state tax liens.  Tr. at 8:24-9:4 (DuBose).

--------

Tr. at 2:2-13 (Court, R. Rivera, L. Rivera).  Later in the hearing, when the Court told this mystery man that he was free to leave the hearing, he responded: "I have -- my wife has got to go with me, she drove me."  Tr. at 5:4-5 (R. Rivera).  Both the man and L. Rivera then left the hearing together.  See Tr. at 5:24-25 (Court)("Have the record reflect that the Riveras are leaving now.").  His Pentateuchal response to the Court's question notwithstanding, the Court concludes that the man at the hearing was R. Rivera.

## LAW REGARDING DEFAULT JUDGMENTS UNDER RULE 55

Rule 55 of the Federal Rules of Civil Procedure sets out a two-step process for a default judgment.  First, a party must obtain a Clerk's entry of default.  See Fed. R. Civ. P. 55(a) ("When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."); Watkins v. Donnelly, 551 F. App'x 953, 958 (10th Cir. 2014)(unpublished)[8]("Entry of default by the clerk is a necessary prerequisite that must be performed before a district court is permitted to issue a default judgment.").  Second, the party must either request the clerk to enter default judgment when the claim is for "a sum certain or a sum that can be made certain by

---

[8]Watkins v. Donnelly is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Watkins v. Donnelly, United States v. Craighead, 176 F. App'x 922 (10th Cir. 2006) (unpublished), Pinson v. Equifax Credit Information Services, Inc., 316 F. App'x 744 (10th Cir. 2009)(unpublished), United States v. $285,350.00 in U.S. Currency, 547 F. App'x 886 (10th Cir. 2013)(unpublished), Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009)(unpublished), Tadlock v. Lahood, 550 F. App'x 541 (10th Cir. 2013)(unpublished), Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656 (10th Cir. 2006)(unpublished), Chavez v. Perry, 142 F. App'x 325 (10th Cir. 2005)(unpublished), Jacobsen v. Commissioner, 551 F. App'x 950 (10th Cir. 2014)(unpublished), Vandagriff v. Commissioner, 486 F. App'x 722 (10th Cir. 2012) (unpublished), United States v. Wankel, 475 F. App'x 273 (10th Cir. 2012)(unpublished), Sorenson v. O'Neill, 73 F. App'x 341 (10th Cir. 2003)(unpublished), and Mathis v. United States, 62 F. App'x 249 (10th Cir. 2003)(unpublished), all have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

computation," Fed. R. Civ. P. 55(b)(1), or, "[i]n all other cases, the party must apply to the court for a default judgment," Fed. R. Civ. P. 55(b)(2).

After entering default judgment, a district court takes all of the well-pleaded facts in a complaint as true.  See United States v. Craighead, 176 F. App'x 922, 925 (10th Cir. 2006) (unpublished); Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974)("While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation."  (citations omitted)).  "If defendant does not contest the amount prayed for in the complaint [by failing to answer] and the claim is for a sum certain or a sum that can be made certain by computation, the judgment generally will be entered for that amount without any further hearing."  United States v. Craighead, 176 F. App'x at 925 (alteration in original)(quoting 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, Federal Practice & Procedure § 2688 (3d ed. 1998)).  See Fed. R. Civ. P. 8(d) ("Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damage, are admitted when not denied in the responsive pleading.").  A court may enter a default judgment for a damage award without a hearing if the amount claimed is "one capable of mathematical calculation." Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d 1189, 1202 (D.N.M. 2007)(Browning, J.) (quoting H.B. Hunt v. Inter-Globe Energy, Inc., 770 F.2d 145, 148 (10th Cir. 1985)(citing Venable v. Haislip, 721 F.2d at 300).  "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."  10A Wright & Miller, supra, § 2688 (quoting Pope v. United States, 323 U.S. 1, 12 (1944)).  "If the damages sum is not certain or capable of easy computation, the court may"

conduct such hearings or order such references as it deems necessary.  Applied Capital, Inc. v. Gibson, 558 F. Supp. 2d at 1202 (citing Beck v. Atl. Contracting Co., 157 F.R.D. 61, 64 (D. Kan. 1994)).  See Fed. R. Civ. P. 55(b)(2)(B) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to . . . determine the amount of damages.").

"Default judgments are a harsh sanction."  Ruplinger v. Rains (In re Rains), 946 F.2d 731, 732 (10th Cir. 1991).  The Court has noted that, "[b]ecause default judgment is a harsh sanction involving a court's power to enter and enforce judgments regardless of the merits of a case, courts do not favor such a sanction 'purely as a penalty for delays in filing or other procedural error.'"  Noland v. City of Albuquerque, CIV 08-0056 JB/LFG, 2009 WL 2424591, at *1 (D.N.M. June 18, 2009)(Browning, J.)(quoting Ruplinger v. Rains (In re Rains), 946 F.2d at 733).

> [S]trong policies favor resolution of disputes on their merits: [T]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.  In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights.  The default judgment remedy serves as such a protection.

Ruplinger v. Rains (In re Rains), 946 F.2d at 732-33 (citations omitted)(internal quotation marks omitted).  See Noland v. City of Albuquerque, 2009 WL 2124591, at *1 (denying motion for default judgment, because the counsel for the defendant City of Albuquerque "entered an appearance three days after Noland filed his motion for default judgment," and, thus, the Court could not "reasonably say that the City of Albuquerque is an essentially unresponsive party, that the adversary process has been halted, or that Noland faces interminable delay because of the City of Albuquerque's actions").

"The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)."  Fed. R. Civ. P. 55(c).  "[T]he good cause required by Fed. R. Civ.

P. 55(c) for setting aside entry of default poses a lesser standard for the defaulting party than the

excusable neglect which must be shown for relief from judgment under Fed. R. Civ. P. 60(b)."

Pinson v. Equifax Credit Info. Servs., Inc., 316 F. App'x 744, 750 (10th Cir. 2009)(unpublished)

(quoting Dennis Garberg & Assocs., Inc. v. Pack-Tech Int'l Corp., 115 F.3d 767, 775 n.6 (10th

Cir. 1997)).   The distinction between setting aside an entry of default and setting aside a default

judgment "reflects the different consequences of the two events and the different procedures that

bring them about."   10A Wright & Miller, supra, § 2692.

> [T]he clerk or the court may enter a default upon the application of the
> nondefaulting party.   The entry simply is an official recognition of the fact that
> one party is in default, as, for example, for failure to comply with the rules, to
> appear as scheduled, or to prosecute the case with due diligence.   The entry is an
> interlocutory step that is taken under Rule 55(a) in anticipation of a final
> judgment by default under Rule 55(b).
>
> In sharp contrast, a final default judgment is not possible against a party in
> default until the measure of recovery has been ascertained, which typically
> requires a hearing, in which the defaulting party may participate; in some
> situations, a jury trial may be made available to determine an issue of damages.
> Moreover, the entry of a default judgment is a final disposition of the case and an
> appealable order.
>
> . . . .
>
> Additional differences between relief from the entry of a default and from
> a default judgment appear in the grounds that will support the motion being
> granted.   Stated generally, the defaulting party is not entitled to relief from a
> judgment as a matter of right under Rule 60(b).   The movant must present a
> justification supporting the relief motion and must establish his contentions if
> challenged.   Although whether relief will be granted is a matter within the sound
> discretion of the trial court, the vacation of a default judgment is subject to the
> explicit provisions of Rule 60(b), which places additional restraints upon the
> court's discretion.   The motion to set aside a default entry, on the other hand, may
> be granted for "good cause shown," which gives a court greater freedom in
> granting relief than is available in the case of default judgments.

10A Wright & Miller, supra, § 2692 (footnotes omitted).

While there are some differences between setting aside the entry of default and setting aside a default judgment, there are some important similarities, including that courts may consider the same factors: whether the party willfully defaulted, whether setting aside the entry of default or default judgment would prejudice the non-movant, and whether the movant has presented a meritorious defense.  See Pinson v. Equifax Credit Info Servs., Inc., 316 F. App'x at 750 ("In deciding whether to set aside an entry of default, courts may consider, among other things, 'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'"  (quoting Dierschke v. O'Cheskey (In re Dierschke), 975 F.2d at 183)); United States v. $285,350.00 in U.S. Currency, 547 F. App'x 886, 887 (10th Cir. 2013)(unpublished)("Three requirements must be met when setting aside a default judgment under Rule 60(b): '(1) the moving party's culpable conduct did not cause the default; (2) the moving party has a meritorious defense; and (3) the non-moving party will not be prejudiced by setting aside the judgment.'" (quoting United States v. Timbers Pres., 999 F.2d 452, 454 (10th Cir. 1993), abrogated on other grounds by Degen v. United States, 517 U.S. 820, 825 (1996))).  The United States Court of Appeals for the Tenth Circuit has, at times, listed two factors rather than three for the standard in setting aside a default judgment:

> Rule 60(b) of the Federal Rules of Civil Procedure permits relief from a final judgment only if the movant can demonstrate justifiable grounds, including mistake, inadvertence, surprise or excusable neglect.  In the case of default judgments, courts have established the further requirement that a movant demonstrate the existence of a meritorious defense.  E.g., Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir. 1970).  A 60(b) motion thus comprehends two distinct aspects[:] justification for relief and a meritorious defense.

In re Stone, 588 F.2d at 1319.  See Sawyer v. USAA Ins. Co., 839 F. Supp. 2d 1189, 1230 (D.N.M. 2012)(Browning, J.)(setting aside a default judgment, because, "when a plaintiff fails to properly serve a defendant, a default judgment is void and should be set aside under rule

60(b)(4)"). "Although how these factors will be evaluated and weighed lies within the discretion

of the trial court to a considerable degree, . . . federal courts are willing to grant relief from a

default entry more readily and with a lesser showing than they are in the case of a default

judgment." 10A Wright & Miller, supra, § 2692 (footnotes omitted). "The standard for setting

aside an entry of default under Rule 55(c) is fairly liberal because '[t]he preferred disposition of

any case is upon its merits and not by default judgment.'" Crutcher v. Coleman, 205 F.R.D. 581,

584 (D. Kan. 2001)(Vratil, J)(quoting Gomes v. Williams, 420 F.2d 1364, 1366 (10th Cir.

1970)). See Applied Capital, Inc. v. Gibson, CIV 05-98 JB/ACT, 2007 WL 5685131, at *20-23

(D.N.M. Sept. 27, 2007)(Browning, J.)(liberally construing a pro se defendant's motion to

dismiss as a motion to set aside the default, but concluding that the pro se defendant did not

show good cause for the Court to set aside the entry of default, because, although setting aside

the entry of default would not prejudice the plaintiff, the pro se defendant was "fully aware of the

need to answer within the given time limitation and chose not to respond timely," and he failed

to appear at a hearing to support his allegation that he had a meritorious defense).

## LAW REGARDING SUMMARY JUDGMENT UNDER RULE 56

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)

(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir.

1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "If the moving party will bear

the burden of persuasion at trial, that party must support its motion with credible evidence --

using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex Corp. v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)[9] (emphasis in original). Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

### 1.    The Genuine-Dispute Standard.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at

---

[9]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law. See 10A Wright & Miller, supra, § 2727, at 470 ("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).

Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    **2.**    **General Analytical Principles.**

    When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); McCleary v. Nat'l Cold Storage, Inc., 67 F. Supp. 2d 1288, 1293 (D. Kan. 1999)(Crow, J.)("[A] summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences."  (citation omitted)).  Fourth, the court cannot grant summary judgment when it is necessary to weigh the credibility of the witnesses involved.[10]   See Fogarty v. Gallegos, 523 F.3d 1147, 1165 (10th Cir. 2008)("On summary

---

[10]A district court may not grant summary judgment on the grounds that the nonmovant's witnesses or affiants lack credibility, i.e., that what they say has a reduced presumption of truth, either because of their character for untruthfulness generally or because they are biased in the case at hand.  A district court may, however, deny summary judgment because the movant's affiants or witnesses do or may lack credibility.

Doubts as to the credibility of the movant's affiants or witnesses may lead the court to conclude that a genuine issue exists. Indeed, as the Advisory Committee states in its Note to the 1963 amendment of Rule 56(e): "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."

. . . .

Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact. Thus, for example, if conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses.

. . . .

A similar problem involving credibility arises when the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment. This situation occurs most commonly in actions in which the main issue involves the movant's state of mind, such as in fraud or defamation cases. Courts have been reluctant to deprive the nonmoving party of the opportunity of testing the credibility of the movant or the movant's witnesses in open court in this context. As explained by one commentator, "there is a justifiable judicial fear of the injustice which could result from judgment based on affidavits asserting facts that are, because of their nature, incapable of being effectively controverted."

In keeping with this attitude, if the moving party fails to make a full disclosure of the facts, the court may refuse to grant summary judgment even though the opponent merely denies the facts on information and belief. However, if all the evidence appears to have been disclosed, ostensibly the movant's credibility is less in doubt and the court, in deciding whether to grant the motion, simply may consider the opposing party's lack of knowledge as a factor, which, when weighed with all the other circumstances in the case, may preclude summary judgment.

10A Wright & Miller, supra, § 2726 (footnotes omitted).

The only formal exception to the rule against granting summary judgment on credibility grounds is the sham-affidavit rule. See infra Law Regarding Summary Judgment Under Rule 56, Part 4. Of course, most cases in which summary judgment is appropriate nonetheless rely, in

judgment, a district court may not weigh the credibility of the witnesses."); Eagle v. La. & S. Life Ins. Co., 464 F.2d 607, 608 (10th Cir. 1972)("Summary judgment is not proper when an issue turns on credibility.").

### 3. Summary Judgment in the Qualified-Immunity Context.

In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment was appropriate where video evidence "quite clearly

---

some sense, on the credibility of the movant's witnesses or affiants. In an intestacy case, for example, the district court accepts the coroner's word that the decedent is in fact dead; this "credibility determination" is entirely appropriate and should prevail unless the nonmovant presents evidence -- not merely argument or representations of counsel -- calling it into question.

The best way to conceptualize the rule against weighing credibility is as a corollary of the master summary-judgment standard: if the evidence presented to the district court at the summary-judgment stage -- no more, no less -- were presented to the jury at trial, and all reasonable inferences -- including inferences about credibility -- were drawn in the nonmovant's favor, and if a directed verdict would be appropriate under these circumstances, then the court is justified in granting summary judgment. The range of "reasonable inferences" about the evidence is broader with witness credibility than it is with documentary or physical evidence, because, with witness testimony, important aspects of the evidence -- such as the witness' demeanor and extemporaneous behavior -- are unseen to the court at the summary-judgment phase, thus giving rise to a wider array of potential inferences.

The weighing of all manner of evidence -- not just witness credibility -- is a core function of the jury and not of the judge. The reason that witness credibility is so often singled out as being an evidence-weighing exercise of which judges should be particularly wary is that, unlike with documentary or forensic evidence, live testimony is intrinsically different -- and better -- than the cold records the judge reviews at the summary-judgment stage. Put differently, a judge is just as equipped to factfind at the summary-judgment stage as he or she is at trial as it relates to documentary or physical evidence; it is the precepts underlying the separation of the judge's and jury's duties, rooted in the Seventh Amendment to the Constitution of the United States, that give rise to the general rule against weighing evidence at the summary-judgment stage. With testimony, on the other hand, even putting foundational judge-jury divisions of labor aside, the judge is less equipped to factfind at the summary-judgment stage -- where all he or she has is a cold record -- than at trial. It is for this reason that judges are not permitted to weigh evidence at the summary-judgment stage even when the case is set for a bench trial, rather than a jury trial. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999)(en banc)("In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true.").

contradicted" the plaintiff's version of the facts.   550 U.S. at 378-81.   The Supreme Court

explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. R. Civ. P. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 538 (1986)(footnote omitted).   "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.   The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott [v. Harris], 550 U.S. at 380).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  In Rhoads v. Miller, 352 F. App'x 289 (10th Cir.

2009)(unpublished)(Tymkovich, J.), the Tenth Circuit "explained that the blatant contradictions

of the record must be supported by more than other witnesses' testimony[.]"  Lymon v. Aramark

Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury."  Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," 550 U.S. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," 550 U.S. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

4.      **The Sham-Affidavit Rule.**

The Tenth Circuit has stated that "[t]here is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)(citing 10B Wright & Miller, supra, § 2738, at 473-74; 6 James Wm. Moore, Moore's Federal Practice ¶ 56.22[1], at 56-1325 to 56-1326 (1985 ed.)).  There are situations, however, where courts "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d at 1237 (citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984); Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364 (8th Cir. 1983); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).  The policy underlying these decisions is the "conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks v. Nimmo, 796 F.2d at 1237 (citation omitted).

> To determine whether a contradicting affidavit seeks to create a sham fact issue, [the Tenth Circuit] ha[s] looked to three factors: whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001)(quoting Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)).  In Ralston v. Smith & Nephew Richards, Inc., the Tenth Circuit found that the district court did not abuse its discretion in excluding later contradictory declarations in rendering its summary judgment ruling.  See 275 F.3d at 973.  The

Tenth Circuit noted that there was no question that the declarant was cross-examined in his deposition, "that he had access to the pertinent evidence at the time of his deposition," and "that there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning" the declarant's testimony "requiring clarification or explanation."  275 F.3d at 973.

### 5.    <u>Deferring Summary Judgment.</u>

Rule 56(d) provides:

> **(d)    When Facts Are Unavailable to the Nonmovant.**
>
> > If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
> >
> > **(1)**    defer considering the motion or deny it;
> >
> > **(2)**    allow time to obtain affidavits or declarations or to take discovery; or
> >
> > **(3)**    issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Before 2010, this rule was rule 56(f); rule 56(d) "carries forward without substantial change the provisions of former subdivision (f)."  Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments.   "A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary judgment motion."  Fed. R. Civ. P. 56(d) advisory committee committee's notes to the 2010 amendments.  The rule permits a nonmovant to show by affidavit or declaration the need for additional discovery; a formal affidavit is thus not required.  <u>See</u> Fed. R. Civ. P. 56(d).  The rule permits a "written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit."  Fed. R. Civ. P. 56(c) advisory committee committee's notes to the 2010 amendments.

When a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993).  "Unless dilatory or lacking in merit," a party's 56[(d)] application "should be liberally treated."  Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554 (citations omitted)(internal quotation marks).  "The general principle of Rule 56(d) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to opposition."  Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000).  Rule 56(d) does not require, however, that summary judgment not be entered until discovery is complete.  See Price ex rel. Price v. W. Res., Inc., 232 F.3d at 784.

"Rule 56[(d)] is not a license for a fishing expedition . . . ."  Lewis v. Ft. Collins, 903 F.2d 752, 758 (10th Cir. 1990).  To invoke rule 56(d), the party filing the affidavit or declaration must state with specificity how the desired time would allow it to meet its burden in opposing summary judgment.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  A party opposing summary judgment may not invoke rule 56(d) based solely upon the assertion that discovery is incomplete or that specific facts necessary to oppose summary judgment are unavailable.  See Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Moreover, while the summary-judgment movant's exclusive control of information weighs heavily in favor of relief under 56(d), see Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783, merely asserting such is insufficient to justify denial of summary judgment, see Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1554.  Furthermore, "if the party filing the Rule 56[(d)] affidavit has been dilatory, or the information sought is either irrelevant to the summary judgment motion or merely cumulative, no extension will be granted."  Jensen v. Redevelopment Agency of Sandy

City, 998 F.2d at 1554 (denying a rule 56(d) request and stating that "the record reflect[ed] that plaintiffs were dilatory in pursuing discovery prior to the filing of their 56[(d)] affidavit"). See Johnson v. Holmes, 377 F. Supp. 2d 1039, 1044-45 (D.N.M. 2004)(Browning, J.)(denying a 56(d) request where plaintiff did not explain why, during the discovery period that the court allowed, he did not obtain the discovery sought in his motion). The Tenth Circuit has summarized rule 56(d)'s requirements as follows:

> A prerequisite to granting relief pursuant to Rule 56[(d)] is an affidavit furnished by the nonmovant. Although the affidavit need not contain evidentiary facts, it must explain why facts precluding summary judgment cannot be presented. This includes identifying the probable facts not available and what steps have been taken to obtain these facts. In this circuit, the nonmovant also must explain[, with specificity,] how additional time will enable him to rebut movant's allegations of no genuine issue of fact.

Price ex rel. Price v. W. Res., Inc., 232 F.3d at 783 (internal quotations and citations omitted). See Tadlock v. Lahood, 550 F. App'x 541, 547 (10th Cir. 2013)(unpublished)(citing Price ex rel. Price v. W. Res., Inc. for rule 56(d)'s requirements after the 2010 amendment); Douglass v. United Auto Workers Local Union 31, 188 F. App'x 656, 658 (10th Cir. 2006)(unpublished) (stating that the affidavit must state how the additional time would enable the party to meet its burden "with specificity"). A rule 56(d) affidavit or declaration must state, with specificity, what additional discovery is believed necessary. See Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1264 (10th Cir. 2006); Chavez v. Perry, 142 F. App'x 325, 334 (10th Cir. 2005) (unpublished)("To resist summary judgment on this basis (56[(d)] ), a party must specifically identify what facts it seeks to discover and show how those facts would materially aid its case on the dispositive issues."). If a party does not file an affidavit or declaration, a district court does not abuse its discretion in denying discovery. See Tadlock v. Lahood, 550 F. App'x at 547.

## RELEVANT LAW REGARDING THE INTERNAL REVENUE CODE

An assessment is a bookkeeping entry "recording the liability of the taxpayer."  26 U.S.C. § 6203.  An assessment is made when a taxpayer "[s]elf-assesses," i.e., files a personal income tax return, or, when the IRS prepares a substitute for return ("SFR"), under 26 U.S.C. § 6020(b). The assessment is important to the creation of a federal tax lien.  See 26 U.S.C. §§ 6321, 6322.

A federal tax lien attaches against a taxpayer's property on the date that the IRS makes its assessment.  See 26 U.S.C. § 6322 ("Unless another date is specifically fixed by law, the lien imposed by section 6321 shall arise at the time the assessment is made and shall continue until the liability for the amount so assessed . . . is satisfied or becomes unenforceable by reason of lapse of time.").  The Supreme Court has noted that the tax lien arising under 26 U.S.C. § 6321 is a valid exercise of Congress' constitutional tax and spending power.  See State of Michigan v. United States, 317 U.S. 338, 340 (1943)("The establishment of a tax lien by Congress is an exercise of its constitutional power 'To lay and collect Taxes.'")(citing U.S. Const. Art. I, § 8). The IRS tax lien is effective against all property and rights to property, whether real or personal, including after-acquired property belonging to the taxpayer.  See Texas Commerce Bank-Fort Worth, N.A. v. United States, 896 F.2d 152, 161 (5th Cir. 1990)("The lien arises on the date that the IRS assesses unpaid taxes, applies to currently owned as well as after-acquired property, and continues until the taxpayer satisfies the debt, or the statute of limitations runs.").  The federal tax lien remains valid and enforceable until the debt is fully satisfied or becomes unenforceable by reason of lapse of time.  See 26 U.S.C. § 6322.  The IRS tax lien is fully perfected and enforceable against the taxpayer upon assessment; to prevail against the taxpayer, there is no need for the IRS to file a notice of lien in the public records.  See W. Nat'l Bank v. United States, 812 F. Supp. 703, 705 (W.D. Tex. 1993); In re Kohout, 236 B.R. 365, 369 (Bankr. N.D.

Ohio 1999).  The statutory lien under 26 U.S.C. § 6321 is "silent" and is always given priority, unless one of the exceptions in 26 U.S.C. § 6323 applies.  W. Nat'l Bank v. United States, 812 F. Supp. at 705.

Section 6323(a) of Title 26 of the United States Code provides that a federal tax lien "shall not be valid as against any purchaser, holder of a security interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary."  26 U.S.C. § 6323(a).  The IRS files a notice of federal tax lien, in part, to protect the priority of its lien against third parties, identified in 26 U.S.C. § 6323(a), that also claim an interest in the taxpayer's property.  For purposes of determining priority between a federal tax lien and a competing lien, "absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that 'first in time is the first in right.'" United States v. McDermott, 507 U.S. 447, 449 (1993).  See United States v. New Britain, 347 U.S. 81, 85 (1954).  Congress has determined in enacting 26 U.S.C. § 6323(a) that, once a notice of the federal tax lien has been filed under 26 U.S.C. § 6323(f), the IRS tax lien shall have priority over the subsequent lien of a competing judgment lien holder or choate interest of a bona fide purchaser.  See 26 U.S.C. § 6323(b)-(c).

IRS Forms 4340 are prima facie evidence of tax liability.  "For purposes of granting summary judgment, a Certificate of Assessment and Payments is sufficient evidence that an assessment was made in the manner prescribed by § 6203 and Treas. Reg. 301.6203-1."  Long v. United States, 972 F.2d 1174, 1181 (10th Cir. 1993)(citing James v. United States, 970 F.2d 750, 755 (10th Cir. 1992); Hughes v. United States, 953 F.2d 531, 539-40 (9th Cir. 1992)).  See United States v. Silkman, 220 F.3d 935, 937 (8th Cir. 2000); United States v. Voorhies, 658 F.2d 710, 715 (9th Cir. 1981)("[T]he certificates of assessment were prima facie correct and therefore

adequate evidence of the amount of [the taxpayer's] tax liability."). Cf. McCarty v. United States, 929 F.2d 1085, 1089 (5th Cir. 1991)(holding that Form 4340 showing "notice of assessment and demand for payment" is admissible under the Federal Rules of Evidence).

## ANALYSIS

The Court will grant the alternative relief that the Motion requests: summary judgment in the United States' favor. The Riveras' legal position has all the hallmarks of a traditional, meritless tax-protestor defense. The federal courts are hostile to such arguments -- frankly, not just to accepting them, but to even hearing them. The United States Court of Appeals for the Fifth Circuit expressed the judiciary's palpable distaste for these arguments in the following, oft-quoted opinion excerpt:

> We perceive no need to refute these arguments with somber reasoning and copious citation of precedent; to do so might suggest that these arguments have some colorable merit. The constitutionality of our income tax system -- including the role played within that system by the Internal Revenue Service and the Tax Court -- has long been established. We affirm the dismissal of Crain's spurious "petition" and the assessment of a penalty imposed by the Tax Court for instituting a frivolous proceeding.
>
> . . . .
>
> We are sensitive to the need for the courts to remain open to all who seek in good faith to invoke the protection of law. An appeal that lacks merit is not always -- or often -- frivolous. However, we are not obliged to suffer in silence the filing of baseless, insupportable appeals presenting no colorable claims of error and designed only to delay, obstruct, or incapacitate the operations of the courts or any other governmental authority. Crain's present appeal is of this sort. It is a hodgepodge of unsupported assertions, irrelevant platitudes, and legalistic gibberish. The government should not have been put to the trouble of responding to such spurious arguments, nor this court to the trouble of "adjudicating" this meritless appeal.

Crain v. Comm'r, 737 F.2d 1417, 1417-18 (5th Cir. 1984)(per curiam). The Tenth Circuit apparently feels much the same way about tax-protestor arguments, having cited the above passage eight times and quoted the line about there being "no need to refute these arguments

with somber reasoning and copious citation of precedent" four times.  Jacobsen v. Comm'r, 551 F. App'x 950, 952 (10th Cir. 2014)(unpublished)("The Tax Court did not expressly enumerate and reject Jacobsen's specific claims.  But it is evident that Jacobsen's claims were properly dismissed."  (citation omitted)); Vandagriff v. Comm'r, 486 F. App'x 722, 724 (10th Cir. 2012) (unpublished); United States v. Wankel, 475 F. App'x 273, 276 (10th Cir. 2012)(unpublished); United States v. Vance, 215 F.3d 1338, at *2 n.1 (10th Cir. 2000)(unpublished).  See Sorenson v. O'Neill, 73 F. App'x 341, 343 (10th Cir. 2003)(unpublished)("We need not waste judicial resources explaining once again why the Sorensons are subject to federal tax laws, just like everyone else who lives in the United States."); Mathis v. United States, 62 F. App'x 249, 251 (10th Cir. 2003)(unpublished); Christensen v. Ward, 916 F.2d 1462, 1475 (10th Cir. 1990); Casper v. Comm'r, 805 F.2d 902, 907 (10th Cir. 1986), overruled on other grounds by Wheeler v. Comm'r, 521 F.3d 1289 (10th Cir. 2008)(Kelly, J., joined by McKay & Anderson, JJ.).[11]

_____

[11]In a somewhat unusual move, in Wheeler v. Commissioner, a Tenth Circuit panel overruled Casper v. Commissioner -- a published Tenth Circuit panel decision in its own right. The general rule in the Tenth Circuit is that "only the en banc court can overrule the judgment of a prior panel," United Food & Commercial Workers Union, Local 1564 of N.M. v. Albertson's, Inc., 207 F.3d 1193, 1198 (10th Cir. 2000), and, although this rule is subject to exception when there has been an intervening Supreme Court decision or when Congress has passed a new statute, see United States v. Tiger, 538 F.3d 1297, 1298 n.4 (10th Cir. 2008)("This Court can overrule a prior panel decision absent en banc reconsideration where there is a superseding contrary decision by the United States Supreme Court."), the panel in Wheeler v. Commissioner noted no such exception.  The panel merely noted, in a footnote: "All active circuit judges agree that to the extent Casper v. Commissioner purports to require a $1,500 sanction for a frivolous appeal from a Tax Court decision, it is overruled."  Wheeler v. Comm'r, 521 F.3d at 1291 n.1.  A subsequent appeal in the same case clarified that overruling Casper v. Commissioner reflected "a departure from the practice in the Seventh Circuit on which our holding in Casper was based," i.e., Casper v. Commissioner was not abrogated by statute or undermined by supervening case from the Supreme Court.   Wheeler v. Comm'r, 528 F.3d 773, 783 n.6 (10th Cir. 2008) (Baldock, J., joined by Briscoe & Lucero, JJ.).
        The Court's research reveals only two other cases in which a Tenth Circuit panel used this method -- representing, in a panel opinion, that all active judges agree to overrule a prior case -- as a substitute for en banc hearing.  In Amoco Production Co. v. Heimann, 904 F.2d 1405 (10th Cir. 1990)(Baldock, J., joined by Seymour & Theis, JJ.)("Heimann"), a Tenth Circuit panel

Given the Tenth Circuit's admonitions against emboldening tax protestors by over-engaging them, the Court will make short work -- or at least shorter work than it usually makes -- of the Riveras' arguments.

The Court will first discuss the Riveras' premier argument -- the one they push the hardest -- which is also the most obscure.   The Riveras assert that they have an exemption

_____

overruled the prior panel decision in <u>Amoco Production Co. v. Jacobs</u>, 746 F.2d 1394 (10th Cir. 1984)("<u>Jacobs</u>").   <u>See</u> <u>Heimann</u>, 904 F.2d at 1414 n.8.   After writing that, "[t]o the extent that <u>Jacobs</u> holds to the contrary [of the panel's legal conclusions], it is overruled," the panel in <u>Heimann</u> dropped the following footnote: "Because this panel opinion overrules Tenth Circuit precedent, it has been circulated among all active judges of this court.   All judges agree with the panel's holding . . . ."   <u>Heimann</u>, 904 F.2d at 1414 & n.8.   In <u>United States v. Taylor</u>, 828 F.2d 630 (10th Cir. 1987)(Holloway, C.J., joined by Timbers & Anderson, JJ.), a Tenth Circuit panel overruled <u>United States v. Brewer</u>, 486 F.2d 507 (10th Cir. 1973), stating:

> As the defendant notes, a panel is not authorized to overrule a prior decision of a court of appeals.   We are authorized, however, by the full court and the concurrence of all its active judges to state that insofar as <u>United States v. Brewer</u> held that venue must be proved by the Government beyond a reasonable doubt, that opinion is overruled.

<u>United States v. Taylor</u>, 828 F.2d at 633.
    There are obvious efficiencies to overruling a prior panel case without convening the en banc court if the prior case is clearly incorrect, even if there is no supervening authority for the subsequent panel to point to.   The Court is not sure what the boundaries of this exception to the prior-panel rule are, however, including (i) whether a majority or supermajority of the active Tenth Circuit judges would suffice, or if they must be unanimous; (ii) what to do if there is a dissent in the subsequent, overruling panel; and (iii) what to do if subsequent Tenth Circuit case law cites or even appears to rely upon the reasoning of the overruled case.   The two times that the Tenth Circuit has exercised this apparent exception to the prior-panel rule, it did so in situations that avoided any such ambiguities; as long as the Tenth Circuit continues to do so, district courts will have no problem ascertaining what cases remain good law and what cases do not.   The exception could, however, still benefit from codification in the Tenth Circuit Local Rules of Appellate Procedure
    At the end of the day, the prior-panel rule is one for the Tenth Circuit, not the Court, to define and enforce.   If a Tenth Circuit panel -- or the en banc court -- purports to overrule a prior Tenth Circuit decision, or if a panel says that supervening authority has overruled a prior Tenth Circuit decision, the Court must conclude that the prior decision is no longer good law.   Likewise, if a subsequent Tenth Circuit panel opinion seems to contradict a prior panel opinion, the Court should not dishonor the subsequent opinion on the ground that it violates the prior-panel rule, but, rather, must find some way to reconcile the two opinions.

account under their names -- or alternate-capitalization variants on their names -- which they can redeem in exchange for relief from their tax liabilities.  They attach their birth certificates to IRS and court documents, and make reference to paying out of "exemption accounts."   To comprehend these arguments, one must understand that tax protestors are a community of sorts.  They must be, as information-sharing is the only way to explain how their theories can be, at once, so uniform and so odd.  Anyone with access to the internet can log into YouTube and watch videos of tax protestors purporting to "teach" viewers how to avoid tax liability -- or any other kind of debt, apparently -- by using the "Accepted for Value" approach.  E.g., Reinabiz5, Utilizing Your Birth Certificate for Money 2 !, YouTube.com (Mar. 12, 2013); The Archiveman, Accepted for Value Explained, YouTube.com (Feb. 8, 2014).  One video's description notes that one can "[p]ay bills with your signature and . . . access your Treasure Bond Account that was created by your birth certificate."  Mike Pamfilis, Accepted for Value, YouTube.com (Jan. 22, 2014).  The Riveras, thus, did not create their theory out of thin air.

As to what the theory means substantively, from what the Court can tell -- and, unsurprisingly, the most visible proponents of this approach are not particularly eloquent or comprehensive in their articulations of the broader intellectual theory behind "Accepted for Value" -- these individuals believe that the United States owns corporate-shell facsimiles of them, over which the individuals retain some control -- enough to draw expenses from the shell.  The Southern Poverty Law Center describes a "philosophy" very similar to the Riveras -- in that it puts forth many of the same strange arguments and has many of the same bizarre hallmarks -- in its page on sovereign citizens:

> Since 1933, the U.S. dollar has been backed not by gold, but by the "full faith and credit" of the U.S. . . .  According to sovereign "researchers," this means that the government has pledged its citizenry as collateral, by selling their future earning capabilities to foreign investors, effectively enslaving all Americans.

This sale, they claim, takes place at birth.  When a baby is born in the U.S., a birth certificate is issued, and the hospital usually requires that the parents apply for a Social Security number at that time.  Sovereigns say that the government then uses that birth certificate to set up a kind of corporate trust in the baby's name -- a secret Treasury account -- which it funds with an amount ranging from $600,000 to $20 million, depending on the particular variant of the sovereign belief system.  By setting up this account, every newborn's rights are cleverly split between those held by the flesh-and-blood baby and the ones assigned to his or her corporate shell account.

The sovereigns believe evidence for their theory is found on the birth certificate itself.  Since most certificates use all capital letters to spell out a baby's name, JOHN DOE, for example, is actually the name of the corporate shell identity, or "straw man," while John Doe is the baby's "real," flesh-and-blood name.  As the child grows older, most of his legal documents will utilize capital letters, which means that his state-issued driver's license, his marriage license, his car registration, his criminal court records, his cable TV bill and correspondence from the IRS all will pertain to his corporate shell identity, not his real, sovereign identity.

The process sovereigns have devised to split the straw man from the flesh-and-blood man is called "redemption," and its purpose is two-fold.  Once separated from the corporate shell, the newly freed man is now outside of the jurisdiction of all admiralty laws.  More importantly, by filing a series of complex, legal-sounding documents, the sovereign can tap into that secret Treasury account for his own purposes.  Over the past 30 years, hundreds of sovereigns have attempted to perfect the process by packaging and promoting different combinations of forms and paperwork.  While no one has ever succeeded, for the obvious reason that these theories are not true, sovereigns are nonetheless convinced with the religious certainty of a true cult believer that they're close.  All it will take, say the promoters of the redemption scam, is the right combination of words.

Sovereign Citizens Movement, Southern Poverty Law Center, http://www.splcenter.org/get-informed/intelligence-files/ideology/sovereign-citizens-movement (last visited June 26, 2015).

This passage describes many of the tactics that the Riveras used in their "briefing."

The SPLC goes on to describe how these individuals operate in the section that it titles "tactics":

The weapon of choice for sovereign citizens is paper.  A simple traffic violation or pet-licensing case can end up provoking dozens of court filings containing hundreds of pages of pseudo-legal nonsense.  For example, a sovereign

was involved in 2010 in a protracted legal battle over having to pay a dog-licensing fee.  She filed 10 sovereign documents in court over a two-month period and then declared victory when the harried prosecutor decided to drop the case.  The battle was fought over a three-year dog license that in Pinellas County, Fla., where the sovereign lives, costs just $20.  Tax cases are even worse.  Sovereign filings in such legal battles can quickly exceed a thousand pages.  While a normal criminal case docket might have 60 or 70 entries, many involving sovereigns have as many as 1,200.  The courts are struggling to keep up, and judges, prosecutors and public defenders are being swamped.

The size of the documents is an issue, but so is the nonsensical language the documents are written in.  They have a kind of special sovereign code language that judges, lawyers and other court staff simply can't understand (nor can most non-sovereigns).  Sovereigns believe that if they can find just the right combination of words, punctuation, paper, ink color and timing, they can have anything they want -- freedom from taxes, unlimited wealth, and life without licenses, fees or laws, are all just a few strangely worded documents away.  It's the modern-day equivalent of "abracadabra."

Sovereign Citizens Movement, Southern Poverty Law Center, http://www.splcenter.org/get-informed/intelligence-files/ideology/sovereign-citizens-movement (last visited June 26, 2015).  This passage helps explain the 687 pages that the Riveras have filed with the Court since the Motion.  None of this material complies with the local rules, and the Court will, therefore, decline to wrestle at length with any of it.  See D.N.M. LR-Civ. 7.4(a) (describing the briefing process); id. 7.8 (describing the process and limitations of submitting supplemental authority); id. 7.5 (laying out page limits for briefs); id. 10.5 (setting forth page limits for exhibits).  The Court is willing to bend the local rules -- or, more accurately, the Court is willing to excuse instances of noncompliance with the local rules -- when parties -- especially pro se parties -- are arguing in good faith, but what the Riveras are doing is the opposite of good faith: they are violating the local rules in the hopes that their violations will overwhelm the Court, and that the Court, out of a good-faith desire to consider all their submissions on the merits, will either defer to them or put off considering the case indefinitely.  The Court has skimmed the Riveras' post-Motion materials to ascertain their noncompliance with the local rules and their substantive lack

of merit, and the Court will treat these materials the same as if the Riveras' had not made a substantive response to the Motion.

Turning back to the applicable law, it turns out that tax protestors' and sovereign citizens' legal arguments are so common that the Tenth Circuit maintains a list of them, which the Court of Appeals directs district courts to reject out of hand.

> As the cited cases, as well as many others, have made abundantly clear, the following arguments alluded to by the Lonsdales are completely lacking in legal merit and patently frivolous: (1) individuals ("free born, white, preamble, sovereign, natural, individual common law 'de jure' citizens of a state, etc.") are not "persons" subject to taxation under the Internal Revenue code; (2) the authority of the United States is confined to the District of Columbia; (3) the income tax is a direct tax which is invalid absent apportionment, and Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, modified, 158 U.S. 601 (1895), is authority for that and other arguments against the government's power to impose income taxes on individuals; (4) the Sixteenth Amendment to the Constitution is either invalid or applies only to corporations; (5) wages are not income; (6) the income tax is voluntary; (7) no statutory authority exists for imposing an income tax on individuals; (8) the term "income" as used in the tax statutes is unconstitutionally vague and indefinite; (9) individuals are not required to file tax returns fully reporting their income; and (10) the Anti-Injunction Act is invalid.
>
> To this short list of rejected tax protester arguments we now add as equally meritless the additional arguments made herein that (1) the Commissioner of Internal Revenue and employees of the Internal Revenue Service have no power or authority to administer the Internal Revenue laws, including power to issue summons, liens and levies, because of invalid or nonexistent delegations of authority, lack of publication of delegations of authority in the Federal Register, violations of the Paperwork Reduction Act, and violations of the Administrative Procedure Act, including the Freedom of Information Act; and (2) tax forms, including 1040, 1040A, 1040EZ and other reporting forms, are invalid because they have not been published in the Federal Register.

Lonsdale v. United States, 919 F.2d 1440, 1448 (10th Cir. 1990).

The Tenth Circuit's laundry list of arguments to reject as frivolous disposes of the bulk of the Riveras' arguments; after throwing out the Lonsdale v. United States arguments, only three of the Riveras' arguments remain standing.  First, to the extent that the Riveras' lower-case-name argument is separate from their larger strawman-redemption argument, the Court rejects it, as has

every court to ever hear it.  See, e.g., United States v. French, 149 F.3d 1192 (10th Cir. 1998);

United States v. Ford, No. MISC 07-0016 JH, 2007 WL 3256212, at *2 (D.N.M. June 7, 2007)

(Herrera, J.); United States v. Washington, 947 F. Supp. 87, 92 (S.D.N.Y. 1996).  Second, the

Universal Declaration of Human Rights does not prohibit foreclosure.  In fact, it does not, as a

legal matter, prohibit anything, because it is not itself a treaty.  See Flores v. S. Peru Copper

Corp., 414 F.3d 233, 259 (2d Cir. 2003)("General Assembly resolutions and declarations do not

have the power to bind member States . . . ."); Haitian Refugee Ctr. v. Gracey, 809 F.2d 794, 816

n.17 (D.C. Cir. 1987)("[T]he Universal Declaration of Human Rights . . . is merely a nonbinding

resolution, not a treaty . . . .").  Third, the Riveras' reliance on 12 U.S.C. § 95a(2) appears to be

in service of their primary argument, i.e., that they can redeem their birth certificate-created

exemption account for relief from their unpaid tax liability.  Subsection (1) of § 95a allows the

President of the United States to regulate or prohibit the hoarding of, or transfer to foreign

nationals of, currency and certain securities and commodities, such as gold and silver bullion.

See 12 U.S.C. § 95a(1).  Subsection (2) indemnifies citizens who comply with subsection (1) and

clarifies that the United States must repay the value of anything turned over to it under

subsection (1).  See 12 U.S.C. § 95a(2).  Section 95a does not, however, create strawman

exemption accounts for all citizens at birth.

　　　Having dispensed with the Riveras' defenses, the Court will now choose between the

alternative forms of relief that the Motion requests.  The Court will grant summary judgment

rather than default judgment.  The Court will not grant default judgment, because the United

States does not appear to have obtained an entry of default from the Clerk's Office, as rule 55(a)

requires.  Securing a default judgment is a two-step process: first obtaining an entry of default

from the Clerk, and only then petitioning the Court[12] for default judgment.  See Fed. R. Civ. P. 55(a)-(b).  Because the United States has not undertaken the first task, the Court will not undertake the second.

Even if the motion for default judgment were not defective, as the United States has already written a summary-judgment motion, the Court finds it preferable to rule on summary judgment grounds -- i.e., on the merits -- rather than on procedural default.  The United States has presented "a concise statement of all of the material facts as to which [it] contends no genuine issue exists."  D.N.M. LR-Civ. 56.1(b).  These facts are "numbered and . . . refer with particularity to those portions of the record upon which the [United States] relies."  D.N.M. LR-Civ. 56.1(b).  See Fed. R. Civ. P. 56(c)(1)(A).  With the United States having done all of that work, the Riveras were required to make their own "concise statement of the material facts cited by [the United States] as to which the [Riveras] contend[] a genuine issue does exist."  D.N.M. LR-Civ. 56.1(b).  Alternatively, the Riveras could have submitted an affidavit to the Court representing that they "cannot present facts essential to justify [their] opposition" and setting forth a plan for obtaining the necessary evidence, and the Court would consider deferring the Motion until the they had the opportunity to develop their response.  See Fed. R. Civ. P. 56(d). The Riveras have not taken either course, and the Court thus finds that the United States' proposed facts are undisputed in their entirety.  See Fed. R. Civ. P. 56(e)(2)-(3).

With the United States' facts undisputed, it has proven everything it needs to secure summary judgment on all claims.  See United States v. Hopkins, 927 F. Supp. 2d 1120, 1182-83 (D.N.M. 2013)(Browning, J.)("[T]he IRS has competent summary judgment evidence of its valid

---

[12]Because the Riveras have "appear[ed]" in this case -- both of them having signed the Special Appearance and appeared in-person at the hearing -- the United States may not seek default judgment directly from the Clerk's Office.  Fed. R. Civ. P. 55(b)(1).

tax assessments against the Hopkins: the Hopkins' Forms 4340."). It attached proper liens pursuant to 26 U.S.C. § 6321, and it commenced a proper action under 26 U.S.C. § 7403. The only entities with an interest in the Sandoval County property are the Riveras and NM Taxation and Revenue, and the United States has properly named them under § 7403(b). It presented the Riveras' form 4340 certificates of assessment, notices of liens, and account transcripts in its Complaint and in its Motion. See Long v. United States, 972 F.2d 1174, 1181 (10th Cir. 1992) ("For purposes of granting summary judgment, a Certificate of Assessment and Payments is sufficient evidence that an assessment was made in the manner prescribed by § 6203 and Treas. Reg. 301.6203-1." (citing James v. United States, 970 F.2d 750, 755 (10th Cir. 1992); Hughes v. United States, 953 F.2d 531, 539-40 (9th Cir. 1992))); United States v. Voorhies, 658 F.2d 710, 715 (9th Cir. 1981)("[T]he certificates of assessment were prima facie correct and therefore adequate evidence of the amount of . . . tax liability."). NM Taxation and Revenue has not opposed -- and, according to the United States' representations at the hearing, does not oppose -- the Motion's factual assertions or legal contentions, or any of the relief that the Motion seeks. See Tr. at 2:16-18 (DuBose). The United States having established the Riveras' delinquency, the Court will "decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States." 26 U.S.C. § 7403(c).

**IT IS ORDERED** that: (i) the United States' Motion for Default Judgment or in the Alternative Motion for Summary Judgment and Memorandum in Support, filed October 30, 2014 (Doc. 15), is denied as to the primary relief sought but granted as to the alternative relief sought; (ii) summary judgment is entered in Plaintiff United States of America's favor on all claims; and

(iii) the Court will order the judicial sale of the Sandoval County, New Mexico property that Defendants Robert and Linda Rivera currently own.

_____
UNITED STATES DISTRICT JUDGE

*Counsel and parties*:

Waymon G. DuBose, Jr.
Tax Division
United States Department of Justice
Dallas, Texas

      *Attorneys for the Plaintiff*

Robert L. Rivera
Placitas, New Mexico

      *Pro se Defendant*

Linda K. Rivera
Placitas, New Mexico

      *Pro se Defendant*

Lewis J. Terr
New Mexico Department of Taxation & Revenue
Santa Fe, New Mexico

      *Attorneys for Defendant New Mexico Department of Taxation and Revenue*